**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**AMANDA FOSTER, ET AL.**                                            **PLAINTIFFS**

**V.**                                                  **CAUSE NO.: 1:07CV39-SA -JAD**

**TUPELO PUBLIC SCHOOL DISTRICT**                                **DEFENDANT**

**MEMORANDUM OPINION**

Comes now before this Court, Defendant Tupelo Public School District's ("TPSD") Motion for Summary Judgment. After reviewing the motions, responses, rules, and authorities, the Court makes the following findings:

*Factual Background*

On October 20, 2006, an anonymous Tupelo High School ("THS") student informed a THS counselor, Jessica Prestage, that another student had intentionally cut herself. Prestage called the student, Amanda Foster, into her office to investigate the allegations. When questioned about the allegation, Foster asserted that she had been cut on her arms and legs while walking in the woods behind her house.

Initially, the counselor sent Amanda back to her class. However, after consulting with other counselors at the high school, Prestage decided to initiate TPSD's "JICK" policy.[1] The "JICK" policy, found in the Tupelo High School Student Handbook, provides that "a threat made by a student to harm self, others or property, creates a risk of injury or death to district employees,

---

[1] There is no indication in the record why this policy is accorded the title "JICK" policy. Because it is referred to as the "JICK" policy throughout testimony and the memoranda submitted by the parties, the Court uses the term as it references the policy on student threats found on page 23 of the 2006-2007 Tupelo High School Student Handbook.

students, and visitors, and further creates a risk of damage to property of the district, employees, students, and visitors." The policy further establishes:

> Students who threaten to harm self, others or threaten to damage or destroy property will be subject to expulsion from TPSD for a term of not less than one year. Students who threaten to harm self, others, or threaten to damage or destroy property must be examined by a licensed private psychologist or psychiatrist at the expense of the parent or guardian to determine appropriateness for either continued attendance or for readmission to the TPSD.

Prestage called Amanda's mother, Catherine Foster, who drove to the high school and met with Amanda Foster, Prestage, school nurse Janet Stratton, and Assistant Principal Alice Hammond. Nurse Stratton examined Amanda at that meeting and found that she specifically had uniform linear cuts approximately one and a half inches long underneath a black armband. The nurse could not conclusively state whether Amanda Foster had intentionally cut herself or not. Alice Hammond testified that she decided to initiate the "JICK" policy based on the following: (a) someone reported that Amanda Foster intentionally cut herself, (b) the cuts were evident on Amanda Foster's arms and legs, and (c) the cuts could not conclusively be determined to have been accidentally made. Assistant Principal Hammond stated that "in that situation, . . . we always go with the side of trying to help the student."

In accordance with the "JICK" policy, Hammond offered Foster two choices, either immediate suspension from school or placement in the alternative school until a report from a licensed mental health professional stating the student did not pose a threat to themselves or others was provided to the school. When given the two possible options available to Amanda, Catherine Foster was adamant that Amanda not be put in the alternative school. Therefore, on the afternoon of October 20, 2006, Amanda Foster was suspended from Tupelo High School.

2

Catherine Foster admits that she left the meeting on October 20 with the understanding that a report from a mental health specialist would be necessary to get Amanda back into Tupelo High School. Instead of a mental health professional, the Fosters obtained a report from Nurse Practitioner Kenneth Cook on October 20, which stated that Amanda had not intentionally harmed herself, and further, she was not a threat to herself of others.

The Fosters were informed by letter that a disciplinary hearing was scheduled on the morning of October 27, 2006, to review Amanda's suspension as required under the "JICK" policy. The letter encouraged the Fosters to attend and present their side of the story to a neutral disciplinary panel.

At the disciplinary hearing, Alice Hammond presented the school's version of events, and Amanda and Catherine Foster responded to the four-member panel. The Fosters offered the report from Kenneth Cook at this meeting, but the panel members declined to accept the report as nurse practitioners are not licensed mental health professionals as the "JICK" policy required. The committee voted unanimously to uphold Amanda's suspension until she was able to produce a written report from a mental health professional stating that she was not a threat to herself or others.

On November 2, 2006, Catherine Foster presented to the school a report from Malachy McCool, a licensed mental health professional, that indicated that after a psychological evaluation, it was determined that Amanda was not a threat to herself or others. Amanda was allowed to return to school on November 3, 2006. Amanda's total suspension did not exceed ten (10) days.

The Fosters filed a § 1983 suit against the Tupelo Public School District alleging that Amanda's Fourteenth Amendment procedural and substantive due process rights were violated because no evidence supported the school district's decision to suspend her. Plaintiffs assert that Amanda Foster was not allowed to make up assignments or complete missed tests. Accordingly, her

grades were negatively affected by her suspension, and she suffered mental anxiety and stress as a result of TPSD's "JICK" policy.

The Defendant filed a Motion for Summary Judgment on January 25, 2008, stating that no genuine issue of material fact existed, and therefore, judgment should be rendered against the Plaintiffs.

*Summary Judgment Standard*

Summary judgment is warranted under Rule 56(c) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. Id. at 323, 106 S. Ct. 2548. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id. at 324, 106 S. Ct. 2548; Willis v. Roche Biomedical Labs., Inc., 61 F.3d 313, 315 (5th Cir. 1995). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002); SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1997); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

4

42 U.S.C. § 1983 states,

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law…

42 U.S.C. § 1983. Section 1983 alone does not create substantive rights. Dismukes v. Hackathorn, 802 F. Supp. 1142, 1444 (N.D. Miss. 1992). Rather, Section 1983 creates a remedy for violation of federal, constitutional, or statutory rights. Cousin v. Small, 325 F.3d 627, 631 (5th Cir. 2003).

To maintain a successful 1983 action, the Plaintiff must prove there has been (1) a deprivation of a federal right (2) that occurred under color of state law, which (3) was caused by a state actor. Victoria W. v. Larpenter, 369 F.3d 475, 482 (5th Cir. 2004); Phillips v. Vandygriff, 711 F.2d 1217, 1221 (5th Cir. 1983). Mere assertions that a defendant violated a plaintiff's rights are insufficient to maintain a Section 1983 claim. Dismukes, 802 F. Supp. at 1444 (citing Easterling v. Glennville, 694 F. Supp. 911, 917 (S.D. Ga. 1986)).

A government entity, such as TPSD, will be held liable if the Plaintiffs allege a violation of constitutionally protected rights inflicted pursuant to an official policy or custom. McKinney v. Irving Indep. Sch. Dist., 309 F.3d 308, 313 (5th Cir. 2002). The Plaintiffs must demonstrate that a constitutional deprivation was suffered, that the deprivation occurred pursuant to a custom or policy of the county, and that there is a direct causal link between the custom or policy and the deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

*A) Procedural Due Process*

Plaintiffs contend that the TPSD "JICK" policy infringed upon Amanda Foster's procedural due process rights because she was suspended without a prior hearing, without any evidence to

support the suspension, and she was unable to confront or cross-examine the anonymous student that made the allegations against Amanda.

The seminal United States Supreme Court case regarding procedural due process in school suspension cases is Goss v. Lopez, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975). There, the Supreme Court outlined a two-step inquiry to determine whether procedural due process is implicated in school suspension cases. The first prong examined the severity of the deprivation to determine if process applies, and the second prong examined what process was required under the Constitution. Id. at 577, 95 S. Ct. 729. In deciding the severity of the deprivation, the Court defined a "temporary suspension" as a suspension of ten days or less. Id. at 581, 95 S. Ct. 729. Accordingly,

> [s]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

Id., 95 S. Ct. 729. Most pertinent here, the Court opined

> We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.

Id. at 584, 95 S. Ct. 729.

Therefore, under United States Supreme Court precedence, a short suspension only requires an "informal give-and-take between student and disciplinarian," in which the student is "told what he is accused of doing and what the basis of the accusation is." Id. at 582, 584, 95 S. Ct. 729.

It is undisputed in this case that Amanda Foster's suspension did not exceed ten days. According to the definition outlined in Goss, therefore, Amanda Foster's suspension was "short" or

"temporary." Therefore, Goss' procedural due process requirements apply to the case *sub judice*.

The record is clear as to what took place on October 20, 2006. Amanda Foster testified that she was called into Prestage's office during second period. She admits that Prestage told her that a student came into her office and told the counselor that Foster was cutting herself. Moreover, Foster affirms that when asked about the cuts and scratches on her arms and legs, she told Prestage they were caused by her going out into the woods.

Catherine Foster testified that Jessica Prestage called her on October 20, 2006, and "basically just told me that Amanda had been accused of cutting . . ." Catherine Foster then admits that she appeared in Prestage's office for a meeting regarding Amanda's potential cutting. During that meeting, the school nurse was called to examine Amanda's cuts. Amanda repeatedly denied cutting herself and told the nurse and the counselor that the cuts were the result of walking in the woods. Catherine and Amanda Foster questioned Prestage and Stratton for the full facts against her at that meeting.

An evidentiary hearing was held on October 27, 2006, to examine Amanda Foster's suspension. Hammond, Prestage, and Stratton's testimony was presented, and then Amanda and her mother were permitted to make statements. Catherine Foster expressly stated that Amanda was allowed to testify that she received the scratches from walking in the woods at that hearing.

Accordingly, as Amanda Foster's suspension did not exceed ten days, the court finds that she was afforded an informal "give-and-take" with her school counselor, the assistant principal, the school nurse, and her mother. Moreover, she was accorded a more formal hearing in which Amanda and her mother were again permitted to rebut the evidence the school officials put forth. Thus, Amanda Foster's procedural due process rights were not violated for being suspended without a

7

hearing.

Goss also states that procedural due process does not require a student to secure counsel, confront or cross-examine witnesses, or call witnesses on his behalf when the suspension is of a temporary nature. 419 U.S. at 584, 95 S. Ct. 729. The Fifth Circuit has rejected "any suggestion that the technicalities of criminal procedure ought to be transported into school suspension cases." Brewer v. Austin Indep. Sch. Dist., 779 F.2d 260, 263 (5th Cir. 1985) (citing Williams v. Dade County Sch. Bd., 441 F.2d 299, 301 (5th Cir. 1971)). This court will not confuse two distinct processes - school disciplinary actions and criminal sentencing proceedings. See Brewer, 779 F.2d at 263.

As has been established, Amanda Foster's temporary suspension did not exceed ten days. Supreme Court precedence does not require TPSD to allow students to cross-examine and confront witnesses against them, and indeed, such practice may cause a chilling effect among students concerned for their endangered friends. Further, in Tasby v. Estes, the Fifth Circuit found that a student's rights in a disciplinary hearing may be properly determined "upon the hearsay evidence of school administrators who investigate disciplinary infractions." 643 F.2d 1103, 1106 (citing Boykin v. Fairfield Board of Educ., 492 F.2d 697, 701 (5th Cir. 1974)). Thus, the Plaintiffs' contention that due process was not provided where TPSD failed to announce the identity of the anonymous student is unfounded. Therefore, there has been no constitutional deprivation, and no Section 1983 procedural due process claim may be maintained against the defendant.

*B) Substantive Due Process*

The Due Process Clause of the Fourteenth Amendment provides that "no State shall … deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend.

8

XIV. The substantive component of this Amendment "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662, (1986)); see also Walton v. Alexander, 44 F.3d 1297, 1302 (5th Cir. 1995).

Because education has not been recognized as a fundamental right under the Constitution, to determine whether Plaintiff's substantive due process rights have been violated, the proper test is whether the government action is rationally related to a legitimate government interest. San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 38-40, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). The Fifth Circuit has stated that all a school official need show is a "rational relationship between the punishment and the offense," and "rarely would that requirement not be satisfied." Brewer, 779 F.2d at 264 (citing Mitchell v. Board of Trustees of Oxford Municipal Separate Sch. Dist, 625 F.2d 660 (5th Cir. 1980)); Hill v. Rankin County, Miss., 843 F. Supp. 1112, 1116 (S.D. Miss. 1993).

Plaintiffs assert that by suspending Amanda Foster, TPSD violated her substantive due process because the Defendant knew she was not a threat to herself or others and had no evidence to support their decision to suspend her. Moreover, Plaintiffs contend that suspending students that are suspected of harming themselves and further mandating that the student pay for the psychological examination themselves represents arbitrary government action that violates students' substantive due process rights.

Neither party disputes that safety of public school personnel, students, and property is a legitimate government interest. Since both parties agree that a legitimate government interest is involved, the next inquiry is whether the punishment is rationally related to that government interest.

9

The "JICK" policy at issue in this case requires suspension and clearly states that prior to readmission to TPSD, the student must be examined by a "licensed private psychologist or psychiatrist at the expense of the parent or guardian." The purpose for this policy as stated in the Tupelo High School Student Handbook is due to TPSD's recognition "that a threat made by a student to harm self . . . creates a risk of injury or death to district employees, students, and visitors, and further creates a risk of damage to property of the district, employees, students, and visitors." Catherine Foster testified that she left the October 20, 2006, meeting with the assistant principal and the school counselor with a copy of the "JICK" policy and admits that she realized the requirements under that policy. Moreover, Foster acknowledges that at that initial October 20 conference with Prestage and Hammond, it was explained to her that Amanda's suspension was necessary because her daughter could hurt herself on school property, could harm teachers and other students, or destroy school property.

When a school district is faced with evidence that one of its students may be inflicting harm to themselves, suspending them in order to remove them from the school facilities is reasonable. See Taylor v. Corinth Pub. Sch. Dist., 917 F. Supp. 464, 467 (N.D. Miss. 1996) (district court found no error when child was prevented from returning to school after the school district reasonably determined that the child was a danger to himself or others). Eradicating the student from the school's general population may be the best method to accommodate the legitimate government interest of protecting the populace. The court acknowledges that in the days of Columbine and Virginia Tech, removing students who may be a threat to themselves or their peers at school for a limited period until they can be psychologically evaluated by a licensed mental health professional is rationally related to the overriding interest in safety in schools.

As the Supreme Court observed more than three decades ago, [t]he system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members and [Section] 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." Wood v. Strickland, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975).

From the evidence presented, TPSD's decision not to allow Foster to return to school was both rationally related to the offenses allegedly committed by Foster, and justified under the established facts. Moreover, TPSD's requirement of submission of a report from a licensed mental health professional stating that Foster was not a threat to herself or others is rationally related to her offense under the policy.

Plaintiff mentions in response to the Defendant's Motion for Summary Judgment that she was deprived of her constitutional right to access to the public school system until she provided a report from a licensed psychologist or psychiatrist at the expense of her parents. Although Plaintiff did not allege the deprivation of access to the public school system in her complaint, the Court has considered its merits and finds this argument unpersuasive.

It is undisputed that Assistant Principal Alice Hammond gave Amanda and Catherine Foster two options under the "JICK" policy: (1) attendance at the Fillmore Center, the alternative school for TPSD, or (2) suspension for no more than ten days. The record is also clear that upon hearing the options, Catherine Foster adamantly refused to send Amanda to the alternative school.[2] When

---

[2]Catherine Foster's deposition testimony reads as follows:

And then she brought out these other papers and she said - - then she wanted to

11

asked if they understood when Hammond offered to allow Amanda to go to the alternative school, her attendance at Fillmore was in lieu of being suspended, both Catherine Foster and Amanda answered, "yes."

The Mississippi Constitution provides for the establishment of free uniform public schools throughout Mississippi. See Mississippi Const. Art. VIII, § 201 (1890); effectuated by Miss. Code Ann. § 37-13-1 (2008). Like the Ohio statute at issue in Goss, this state statute implicitly guarantees fundamentally fair procedures in determining conduct that constitutes withdrawal of public education. See Goss, 419 U.S. at 574, 95 S. Ct. 729 ("Having chosen to extend the right to an education to people of appellees' class generally, Ohio may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred").

The Fifth Circuit has noted that there is no property interest to a particular kind of education or curriculum. Nevares v. San Marcos Consol. Indep. Sch. Dist., 111 F.3d 25, 26-27 (5th Cir. 1997) (citing Arundar v. DeKalb Cty. School Dist., 620 F.2d 493 (5th Cir. 1980)). Moreover, the Fifth Circuit determined that transfer to an alternative school program was not a denial of access to public education. Id. Accordingly, Amanda Foster was not denied any right to public education; her mother willfully refused the public education that TPSD offered in lieu of suspension. Additionally, requiring parents to pay for psychological examinations prior to readmission is not a punishment or deprivation of individual liberty as contemplated under the Fourteenth Amendment substantive due

---

    send her to Fillmore. I said, Fillmore, wait a minute. Did they not make Carver a regular school so is Fillmore the alternative school and she said, yes. I said, no, I refuse. I blatantly stood up and said, I refuse. I will not do this.

process clause.

## *Conclusion*

"The authority possessed by the State to prescribe and enforce standards of conduct in its schools although concededly very broad, must be exercised consistently with constitutional safeguards." Goss, 419 U.S. at 574, 95 S. Ct. 729. TPSD afforded Amanda Foster the requisite procedural and substantive due process mandated by the Constitution. Accordingly, the Defendant's Motion for Summary Judgment is granted, and Plaintiff's claims dismissed.

A separate order shall issue herewith.

SO ORDERED, this the   28th   day of May, 2008.

　　　　　　　　　　　　　　　　　　　　 **/s/ Sharion Aycock**　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　　**U.S. DISTRICT JUDGE**